FILED _____ LODGED
_____ RECEIVED _____ COPY

MAY 17 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General
Department of Justice, Tax Division

AMANDA R. SCOTT
Trial Attorney
Wisconsin State Bar No. 115668
Department of Justice, Tax Division
150 M Street NE
Washington, D.C. 20002
Telephone: 202-718-2056
Email: amanda.r.scott@usdoj.gov

LAUREN K. POPE
Trial Attorney
Illinois State Bar No. 6333202
Department of Justice, Tax Division
150 M Street NE
Washington, D.C. 20002
Telephone: 202-746-9068
Email: lauren.k.pope@usdoj.gov

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | No. | CR-24-00733-PHX-DWL (JZB) |
|---|---|---|
| Plaintiff. | | |
| vs. | | PLEA AGREEMENT |
| Kent Ellsworth, | | |
| Defendant. | | |

Plaintiff, United States of America, by and through U.S. Department of Justice Tax Division Trial Attorneys Amanda R. Scott and Lauren K. Pope, and the defendant, Kent Ellsworth (hereinafter, "the defendant" or "Ellsworth"), personally and by counsel, Jason Silver, hereby agree to resolve this matter on the following terms and conditions:

1. **PLEA**

The defendant will plead guilty to a two-count information charging the defendant

with two violations of 26 United States Code (U.S.C.) § 7206(2), a Class E felony offense.

2.  **MAXIMUM PENALTIES**

   a.    A violation of 26 U.S.C. § 7206(2) is punishable by a maximum fine of $250,000, a maximum term of imprisonment of three years, or both, and a term of supervised release of not more than one year, plus the costs of prosecution. A maximum term of probation is five years. Mandatory restitution pursuant to 18 U.S.C. §§ 3663 and/or 3663A does not apply to violations of 26 U.S.C. § 7206(2).

   b.    According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

      (1)    pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

      (2)    serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

      (3)    pay upon conviction a $100 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

   c.    The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

3.  **AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

   a.    Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States agrees not to bring other charges against the defendant based on information currently known to the United States Attorney's Office for the District of Arizona, the United States Attorney's Office for the District of Colorado, and the U.S. Department of Justice, Tax Division concerning the promotion, sale, and implementation of the abusive-trust tax shelter described in the indictment charged in *United States v. Larry Conner et al.*, No. 1:23-CR-390-RMR (D.

1  Colo.), ECF No. 1.

2        b.     This agreement does not, in any manner, restrict the actions of the United

3  States in any other district or bind any other United States Attorney's Office.

4  **4.    <u>AGREEMENTS REGARDING SENTENCING</u>**

5        a.     Non-Binding Recommendations. Pursuant to Fed. R. Crim. P. 11(c)(1)(B),

6  the United States agrees that the sophisticated means enhancement under U.S.S.G. §

7  2T1.4(b)(2) is not applicable; that no aggravating role enhancement is applicable under

8  U.S.S.G. § 3B1.1; and that the defendant qualifies for the zero-point offender adjustment

9  per U.S.S.G. § 4C1.1(a). The United States further agrees to recommend that any sentence

10  imposed on Count One and Count Two, respectively, run concurrently. Finally, if the Court

11  orders the defendant to serve a term of supervised release or probation, the United States

12  agrees to recommend that the Court not order restitution as a condition of supervised

13  release or probation. The defendant understands that these recommendations are not

14  binding on the Court. The defendant further understands that the defendant will not be

15  permitted to withdraw the guilty plea if the Court does not follow a recommendation.

16        b.     Assets and Financial Responsibility. The defendant shall make a full

17  accounting of all assets in which the defendant has any legal or equitable interest. The

18  defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or

19  transfer any such assets or property before sentencing, without the prior approval of the

20  United States (provided, however, that no prior approval will be required for routine, day-

21  to-day expenditures). The defendant also expressly authorizes the United States Attorney's

22  Office and/or Tax Division to immediately obtain a credit report as to the defendant in

23  order to evaluate the defendant's ability to satisfy any financial obligation imposed by the

24  Court. The defendant also shall make full disclosure of all current and projected assets to

25  the U.S. Probation Office immediately and prior to the termination of the defendant's

26  supervised release or probation and agrees such disclosures may be shared with the Tax

27  Division and/or U.S. Attorney's Office, including the Financial Litigation Unit, for any

28  purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility

1  Program to fulfill all financial obligations due and owing under this agreement and the law.

2      c.      Acceptance of Responsibility. If the defendant makes full and complete

3  disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's

4  commission of the offense, and if the defendant demonstrates an acceptance of

5  responsibility for this offense up to and including the time of sentencing, the United States

6  will recommend a two-level reduction to the applicable Sentencing Guidelines offense

7  level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more,

8  the United States will move the Court for an additional one-level reduction to the applicable

9  Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

10  **5.      COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

11      a.      If the Court, after reviewing this plea agreement, concludes that any

12  provision contained herein is inappropriate, it may reject the plea agreement and give the

13  defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P.

14  11(c)(5).

15      b.      If the defendant's guilty plea or plea agreement is rejected, withdrawn,

16  vacated, or reversed at any time, this agreement shall be null and void, the United States

17  shall be free to prosecute the defendant for all crimes of which it then has knowledge and

18  any charges that have been dismissed because of this plea agreement shall automatically

19  be reinstated. In such event, the defendant waives any and all objections, motions, and

20  defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional

21  restrictions in bringing later charges or proceedings. The defendant understands that any

22  statements made at the time of the defendant's change of plea or sentencing may be used

23  against the defendant in any subsequent hearing, trial, or proceeding subject to the

24  limitations of Fed. R. Evid. 410.

25  **6.      WAIVER OF DEFENSES AND APPEAL RIGHTS**

26      The defendant waives (1) any and all motions, defenses, probable cause

27  determinations, and objections that the defendant could assert to the indictment or

28  information; and (2) any right to file an appeal, any collateral attack, and any other writ or

- 4 -

1   motion that challenges the conviction, an order of restitution or forfeiture, the entry of
2   judgment against the defendant, or any aspect of the defendant's sentence, including the
3   manner in which the sentence is determined, including but not limited to any appeals under
4   18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255
5   (habeas petitions). and any right to file a motion for modification of sentence, including
6   under 18 U.S.C. § 3582(c) (except for the right to file a compassionate release motion under
7   18 U.S.C. § 3582(c)(1)(A) and to appeal the denial of such a motion). This waiver shall
8   result in the dismissal of any appeal, collateral attack, or other motion the defendant might
9   file challenging the conviction, order of restitution or forfeiture. or sentence in this case.
10  This waiver shall not be construed to bar an otherwise-preserved claim of ineffective
11  assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section
12  II.B of Ariz. Ethics Op. 15-01 (2015)).

13  **7.      DISCLOSURE OF INFORMATION**

14          a.      The United States retains the unrestricted right to provide information and
15  make any and all statements it deems appropriate to the U.S. Probation Office and to the
16  Court in connection with the case.

17          b.      Any information, statements, documents, and evidence that the defendant
18  provides to the United States pursuant to this agreement may be used against the defendant
19  at any time.

20          c.      The defendant shall cooperate fully with the U.S. Probation Office. Such
21  cooperation shall include providing complete and truthful responses to questions posed by
22  the U.S. Probation Office including, but not limited to, questions relating to:

23                  (1)     criminal convictions. history of drug abuse. and mental illness; and
24                  (2)     financial information. including present financial assets or liabilities
25  that relate to the ability of the defendant to pay a fine or restitution.

26  **8.      FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

27          a.      Nothing in this agreement shall be construed to protect the defendant from
28  administrative or civil forfeiture proceedings or prohibit the United States from proceeding

with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including any restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

9.   **ELEMENTS**

a.   **Count One**

**Aiding or Advising False Income Tax Return**

**(26 U.S.C. § 7206(2))**

On or about April 9, 2019, in the District of Arizona:

1.   The defendant aided and assisted an individual taxpayer with the initials J.B. in the preparation and presentation of an income tax return that was false and fraudulent;

2.   The income tax return was false and fraudulent as to any material matter necessary to a determine of whether income tax was owed; and

3.   The defendant acted willfully.

b.   **Count Two**

**Aiding or Advising False Income Tax Return**

**(26 U.S.C. § 7206(2))**

On or about April 16, 2022, in the District of Arizona:

1.   The defendant aided and assisted an individual taxpayer with the initials D.J. in the preparation and presentation of an income tax return that was false and fraudulent;

2.   The income tax return was false and fraudulent as to any material

1             matter necessary to a determine of whether income tax was owed; and

2             3.     The defendant acted willfully.

3 **10.**    **FACTUAL BASIS**

4         a.     The defendant admits that the following facts are true and that if this matter

5 were to proceed to trial the United States could prove the following facts beyond a

6 reasonable doubt.

7         b.     At all times relevant to this Agreement:

8            <u>Tax Rules for Trusts and Charitable Organizations</u>

9         c.     The Internal Revenue Service ("IRS") was an agency of the U.S. Department

10 of Treasury responsible for enforcing and administering the tax laws of the United States

11 and collecting taxes owed to the United States. Federal tax laws required every U.S. citizen

12 and resident ("taxpayer") who received income exceeding the minimum filing amount

13 established by law for a particular tax year to make and file annually a Form 1040, U.S.

14 Individual Income Tax Return ("Form 1040"), wherein a taxpayer reported certain required

15 items, including income, deductions, and any tax due and owing.

16         d.     For the purposes of federal taxation, income generally included, among other

17 items, compensation for services performed by a taxpayer and income generated by a

18 taxpayer's trade or business. Income that was earned by one person could not be assigned

19 to another individual or entity for federal income tax purposes. That is, the person who

20 *earned* income in any given year was required to pay tax on that income, even if he or she

21 gave the right to *receive* the income to another person or entity, including a trust.

22         e.     A trust was an arrangement "whereby trustees take title to property for the

23 purpose of protecting or conserving it for the beneficiaries[.]" 26 C.F.R. § 301.7701-4(a).

24 A trust involved three distinct parties: The "grantor" was the party that initially conveyed

25 money, property, or other assets to the trust and thereby relinquished legal title of the

26 property to the trust. The "beneficiary" was the party that benefitted from assets conveyed

27 to the trust. The "trustee" was the party responsible for managing the trust's assets for the

28 benefit of the beneficiary.

f.      All income generated or received by a trust was subject to federal income tax. Depending on who controlled and benefited from the trust's income and assets, either the trust, the beneficiary, and/or the grantor had to pay federal income tax on the trust's income. If the grantor *retained* the power to control and direct the trust's income and assets—including for his or her own benefit and enjoyment—the IRS treated the trust as a "grantor trust." Income earned by a grantor trust was taxed to the grantor, meaning that the grantor was required to report such income on the grantor's Form 1040 and pay any federal income tax owed on that income. This was because the IRS treated the grantor as the owner of all the trust's assets. *See* 26 U.S.C. §§ 671–677.

g.      When the grantor *relinquished* the power to control and direct the trust's assets and income and instead conveyed that power to an independent trustee, the IRS treated the trust as a "non-grantor trust." In this arrangement, the trust was treated as a separate taxpayer from the grantor. As such, the trustee generally had to make and file annually a Form 1041, U.S. Income Tax Return for Estates and Trusts ("Form 1041") on the non-grantor trust's behalf to report certain required items, including income, deductions, and any tax due and owing. The trustee also was required to pay any federal income tax owed on the trust's behalf.

h.      The Internal Revenue Code allowed non-grantor trusts to claim certain federal tax deductions on its Form 1041 to reduce its taxable income. When applicable, the trust could deduct (1) the costs incurred administering the trust that would not have been incurred if the trust assets were not held by the trust and/or (2) distributions paid to its beneficiaries. *See* 26 U.S.C. §§ 67(e), 661. Distributions from a trust to its beneficiaries were taxable to the beneficiary, meaning that the beneficiary was required to report the distribution as income on the beneficiary's tax return and pay any federal income tax owed on that distribution.

i.      The Internal Revenue Code also allowed taxpayers, including non-grantor trusts, to claim a tax deduction for charitable donations made within any given tax year. To claim a charitable donation tax deduction, the trust, individual, or other taxpayer had to

- 8 -

1  completely relinquish dominion and control over the donated property and could not retain
2  enjoyment of the donation or otherwise expect a substantial benefit in return.

3       j.    A charitable organization was an entity organized and operated exclusively
4  for religious, charitable, scientific, testing for public safety, literary, educational, or other
5  purposes specified in the Internal Revenue Code and that, if it met certain other
6  requirements, could be tax-exempt under Internal Revenue Code Section 501(c)(3). An
7  organization was not tax-exempt under the Internal Revenue Code if any part of the net
8  earnings inured to the benefit of any private shareholder or individual.

9       k.    An Exemption Determination Letter was a letter that the IRS issued to an
10  organization if its application and supporting documents established that it met the
11  particular requirements of the section under which the organization claimed tax-exempt
12  status. The IRS issued Exemption Determination Letters based on the representations made
13  in the organization's application and supporting documents. If the organization did not
14  operate exclusively for one or more purposes set forth in the Internal Revenue Code but
15  represented on its application and supporting documents that it did, that organization was
16  not tax-exempt.

17       l.    A private foundation was an organization that could achieve federal tax-
18  exempt status if it was organized and operated exclusively for one or more of the charitable
19  purposes set forth in the Internal Revenue Code. Private foundations could be organized as
20  a corporation or a trust and were controlled by the foundation manager designated under
21  the foundation's articles of incorporation, bylaws, or trust instrument. A private foundation
22  generally was required to file with the IRS an annual information return called a Form 990-
23  PF, Return of Private Foundation ("Form 990-PF") to report information regarding, among
24  other information, the contributions it received during a given tax year, including donations
25  made by trusts or other entities, and its assets, charitable distributions, and charitable
26  activities.

27

28

Background on Abusive Trusts

m.     The IRS had published notices and guidance to warn taxpayers about marketed "abusive trust arrangements," which falsely claim to avoid federal income tax. *See, e.g.,* IRS Gen. Couns. Mem. AM 2023-006; IRS Notice 97-24, 1997-1 C.B. 409. Often, promoters of these schemes falsely promised that taxpayers could use trusts to substantially reduce or eliminate their taxable income and deduct personal expenses—all without any meaningful change in the taxpayer's control over or benefit from the income and assets nominally assigned to the taxpayer's purported trusts.

n.     Just because a promoter or taxpayer labelled an arrangement as a "trust" did not mean that the IRS would treat it as such for tax purposes. It was a "fundamental tax principle" that an entity or transaction would be taxed based on its economic substance, not its form. *Rogers v. United States,* 281 F.3d 1108, 1116 (10th Cir. 2002). The creation of a trust had economic substance if it met two requirements: First, the transaction must have meaningfully changed the taxpayer's economic position apart from federal income tax effects and, second, the taxpayer must have had a substantial purpose apart from tax avoidance for entering such transaction. 26 U.S.C. § 7701(o)(1)(A)–(B). If a purported non-grantor trust lacked economic substance, the IRS deemed the trust to be a "sham trust" and reassigned the trust's income to the grantor in his or her individual capacity. The grantor was then responsible for reporting the trust's income on a Form 1040 and paying any federal income tax due on that income.

The Abusive-Trust Tax Shelter Scheme

*Introduction*

o.     From on or about May 1, 2017, through in or around August 2023, Ellsworth knowingly prepared and filed false and fraudulent tax returns in the names of others for the 2016 through 2022 tax years and, in so doing, knowingly and intentionally participated in a scheme to defraud the IRS. This scheme involved the promotion, sale, and implementation of a fraudulent tax shelter (hereinafter, "Abusive-Trust Tax Shelter"), which utilized a series of sham trusts designed to conceal a taxpayer's income. Taxpayers

who purchased and used the Abusive-Trust Tax Shelter (hereinafter, "Participants") were instructed to assign the bulk of their income to these sham trusts to create the illusion that the income assigned to the trusts was not owned and controlled by the Participants. In reality, however, the trusts were nothing more than an extension of the Participants themselves, designed to hold income Participants earned, controlled, and used. Ellsworth financially benefitted from his participation in this scheme by charging Participants for the preparation and filing of false and fraudulent federal tax returns consistent with the fraudulent shelter.

p.    The sole purpose of the Abusive-Trust Tax Shelter was to facilitate tax evasion. Ellsworth prepared and filed, and caused to be prepared and filed, over five hundred false and fraudulent Forms 1040, Forms 1041, and Forms 990-PF for about sixty Participants. In so doing, Ellsworth helped those Participants shelter, and caused to be sheltered, over $60,184,000 in earned income for tax years 2016 through 2022. The preparation and filing of these false and fraudulent federal income tax returns caused an approximate loss of over $16,851,000 to the U.S. Department of Treasury in the form of unpaid federal income taxes.

*Relevant Individuals and Entities*

q.    The defendant was a resident of Mesa, Arizona and Queen Creek, Arizona. From October 3, 2016, through at least 2022, Ellsworth owned and operated a tax return preparation business, Ellsworth Stauffer P.C. ("ESPC"), which provided services to clients for a fee from its office in Mesa, Arizona. Ellsworth sold ESPC on April 1, 2020. Afterward, Ellsworth continued to provide tax return preparation services to clients through ESPC through at least August 2023. In 1996, Ellsworth became licensed as an IRS enrolled agent. Ellsworth maintained this license through 2022.

r.    Larry Conner ("Conner"), charged elsewhere, was a resident of the state of Kansas and Frisco, Texas. From at least 2016 through September 22, 2023, Conner promoted, sold, and implemented the Abusive-Trust Tax Shelter to clients nationwide in the name of The Business Solutions Group.

- 11 -

1      s.    Timothy McPhee ("McPhee"), charged elsewhere, was a resident of Estes

2  Park, Colorado. From at least February 2017 through at least September 22, 2023, McPhee

3  co-owned and operated a business called Private Banking Concepts with his spouse,

4  through which he promoted the Abusive-Trust Tax Shelter and other purported financial

5  strategies.

6      t.    Roderick Prescott ("Prescott"), charged elsewhere, was a resident of

7  Oceanside, California and Mesquite, Nevada. From at least 2016 through at least 2023,

8  Prescott owned and operated a business called The Stewardship Institute, through which

9  Prescott, using the alias "Rick Scott," promoted and sold purported "private family

10 foundations" to clients nationwide.

11     u.    An individual with the initials C.H., referred to here as "Individual A," was

12 a resident of Lincoln, California. From at least 2016 through at least 2023, Individual A

13 assisted Prescott in promoting purported "private family foundations" through The

14 Stewardship Institute.

15     v.    An individual with the initials T.F., referred to here as "Individual B," was a

16 resident of the state of Missouri, the state of Texas, and/or Mexico. From at least 2016

17 through his death in June 2022, Individual B promoted and sold purported "pure trust

18 organizations in common law" through a business Individual B owned and operated.

19     w.    Participant J.B. was a resident of Gilbert, Arizona. From at least January 1,

20 2016 through at least December 31, 2021, J.B. was a chiropractor who wholly owned and

21 operated businesses involved in chiropractic product sales and other healthcare-related

22 business activities in Gilbert, Arizona and Mesa, Arizona.

23     x.    Participant D.J. was a resident of Columbia, Tennessee and Franklin,

24 Tennessee. From at least January 1, 2017 through at least December 31, 2021, D.J. was a

25 chiropractor who wholly owned and operated a chiropractic and alternative wellness clinic

26 with offices in Wichita, Kansas and Franklin, Tennessee, among other businesses.

27

28

- 12 -

*The Abusive-Trust Tax Shelter: Design and Mechanics*

y.     The Abusive-Trust Tax Shelter involved a multi-tiered trust structure typically consisting of three sham trusts and a purported charitable foundation that was also organized as a trust. The sham trusts were successively layered, meaning that each trust named the next trust in the series as its beneficiary. Ellsworth, Conner, McPhee, Prescott, and others referred to the sham trusts as a "business trust," a "family trust," and a "charitable trust," and referred to the purported charitable foundation as a "private family foundation."

z.     To carry out the fraudulent shelter, Conner and McPhee instructed Participants to assign approximately 98% of their business income to a sham business trust to create the illusion that the Participant did not earn such income. Thereafter, the "business trust" would distribute its income to the "family trust," which, in turn, would distribute its income to the "charitable trust." Each sham trust in the series would also report fraudulent tax deductions matching (or exceeding) the income reported on its Form 1041, and the charitable trust claimed to "donate" any remaining income to a purported tax-exempt "private family foundation." Participants could then access "donated" funds anytime by causing the so-called charitable foundation to "loan" the funds back to his or her business, business trust, or family trust tax free. Thus, for any given year, regardless of the amount of income earned or received by Participants, each trust reported $0 in taxable income and paid $0 in taxes. As a result, Participants paid no taxes on upwards of 98% of their income.

*Promotion and Sale of the Abusive-Trust Tax Shelter*

aa.    Conner, McPhee, Prescott, Individual A, and Individual B conducted seminars throughout the United States where they promoted this tax fraud scheme and recruited individuals, most of whom were successful business owners, to purchase the Abusive-Trust Tax Shelter. Conner and others typically charged an attendance fee at the seminars.

bb.    At these workshops, and in other distributed materials, Conner and others advised prospective clients to create sham trusts, including a purported charitable "private

1   family foundation," for the purpose of filing false tax returns and evading the assessment
2   of federal income tax on nearly all income generated by the prospective client's business.
3   Prescott and Individual A taught and distributed materials about the purported "private
4   family foundation" at these workshops and, among other topics, explained how the
5   purported charitable foundation worked in conjunction with the sham trusts to receive and
6   hold earned income for the purpose of evading the assessment of federal income tax on
7   such income.

8       cc.    Participant J.B. also hosted seminars about various healthcare topics. J.B.
9   invited Conner and others to speak about the Abusive-Trust Tax Shelter at these seminars,
10  including one on January 26th to 29th, 2017 in Tempe, Arizona. On January 20, 2017, J.B.
11  forwarded Ellsworth an invitation to this seminar via email, which read, in part: "Infinite($)
12  Wealth, Growth & Protection! *LEARN How [J.B.] has become [J.B.'s] Own Banker, &
13  uses Int. Trusts and a Private Family Foundation. Speakers: [J.B.], . . . Larry Conner,
14  MBA" and others.

15      dd.    Ellsworth first learned about these seminars and, more generally, the
16  Abusive-Trust Tax Shelter from Participant J.B. in 2016. Thereafter, Ellsworth attended
17  several trust and foundation seminars conducted by Conner, Prescott, Individual A,
18  Individual B, and others, including in Texas.

19      ee.    To purchase the sham trusts and purported charitable foundation, Participants
20  were instructed to pay Conner approximately $25,000 to $50,000. For these fees, Conner
21  procured two sets of trust documents for each sham trust and a set of trust documents for
22  the purported charitable foundation, which were drafted by Prescott, Individual A, and
23  Individual B. Conner and others told Participants to sign the sham trust documents as
24  "trustee" and to choose someone else to sign as "grantor." Conner and McPhee explained
25  to Participants that the person signing as "grantor" should not read the documents and that
26  such person would be merely a buffer or a witness.

27      ff.    Those trust documents purported to create non-grantor trusts, but the
28  documents did not reflect reality. In reality, and as Ellsworth knew from conversations with

1    Participants and his review of bank statements and financial records for Participants and
2    their purported trusts, Participants acted as grantor, trustee, *and* beneficiary of their sham
3    trusts and purported private foundation.

4                           *Bookkeeping & Tax Return Preparation*

5         gg.    To create the illusion that Participants did not earn, control, and benefit from
6    the funds nominally held in the name of their sham trusts and purported charitable
7    foundation, Conner and others referred Participants to handpicked accountants,
8    bookkeepers, and tax return preparers, including Ellsworth. In so doing, Conner and others
9    ensured that someone familiar with the Abusive-Trust Tax Shelter would provide ongoing
10   financial and tax services for Participants consistent with their fraudulent methodologies.

11        hh.    Conner trained Ellsworth how to prepare federal tax returns consistent with
12   the Abusive-Trust Tax Shelter. Among other guidance, Conner instructed Ellsworth that
13   all income diverted to the sham trusts should be reported on a single line item on the sham
14   trust's Form 1041 and that all expenses paid by the sham trust, even if spent on personal
15   expenses, should be reported on a single line item as deductible expenses of the sham trust.
16   This fraudulent return-preparation methodology disguised non-deductible personal
17   expenses as expenses of the trust to reduce the sham trusts' taxable income.

18        ii.    For a fee, Ellsworth provided tax return preparation services for
19   approximately sixty Participants who hired ESPC. Ellsworth typically charged
20   approximately $400 for the preparation of individual tax returns, $600 for business tax
21   returns, $750 for trust tax returns, and $1,250 for foundation tax returns.

22        jj.    Ellsworth prepared and caused to be prepared over five hundred false Forms
23   1040, Forms 1041, and Forms 990-PF for Participants who hired ESPC to prepare income
24   tax returns consistent with the Abusive-Trust Tax Shelter. The Forms 1040 substantially
25   underreported Participants' income, which resulted in the payment of far lower taxes by
26   Participants. The Forms 1041 and Forms 990-PF fraudulently reported income that
27   Participants earned, controlled, and benefitted from individually as income of the sham
28   trusts and purported charitable foundations. The false Forms 1041 also fraudulently

- 15 -

1   claimed deductions for personal and other non-deductible expenses incurred by
2   Participants individually. As a result, virtually all returns prepared by Ellsworth for the
3   Participants' sham trusts claimed $0 in federal income taxes despite collectively reporting
4   over $141,658,000 in income.

5        kk.   In reality, however, as Ellsworth knew, Participants earned, controlled, and
6   benefitted from the funds nominally held in the name of their sham trusts and purported
7   private foundation, which were not, as Ellsworth further knew, managed by an independent
8   third-party trustee. Accordingly, Ellsworth should have caused that income to be reported
9   on Participants' Forms 1040, which he did not do.

10        ll.   In total, Ellsworth's preparation and filing of these false and fraudulent tax
11   returns fraudulently concealed from the IRS approximately $60,184,237 in income earned
12   by Participants who purchased and used the Abusive-Trust Tax Shelter for tax years 2016
13   through 2022. This resulted in about $16,851,586 in unpaid federal income taxes.

14       <u>Counts One and Two: False Tax Returns for Participants D.J. & J.B.</u>

15                   *Participant J.B.*

16        mm.   Ellsworth caused the preparation and filing of false federal tax returns that
17   fraudulently underreported Participant J.B.'s income for tax years 2016 through at least
18   2021. During those years, J.B. used the Abusive-Trust Tax Shelter to avoid paying federal
19   income tax. J.B.'s fraudulent tax shelter included a "business trust" with the initials T.1.T.,
20   a "family trust" with the initials B.1.F.T., a "charitable trust" with the initials B.1.F.C.T.,
21   and a "private family foundation" with the initials I.G.W.T. Ellsworth knew that J.B. used
22   the Abusive-Trust Tax Shelter and that J.B. controlled and funded those sham trusts and
23   purported charitable foundation. Ellsworth further knew that J.B. did not need permission
24   from any third party to access the funds purportedly held in the name of the trusts or
25   foundation.

26        nn.   Throughout tax years 2016 through 2021, Ellsworth prepared and caused to
27   be prepared annual financial summaries, such as balance sheets and profit-and-loss
28   summaries, for several entities controlled by Participant J.B., including J.B.'s sham trusts

and purported foundation and J.B.'s chiropractic and healthcare-related businesses with the initials H.P.P. and H.P.S. Ellsworth prepared those financials summaries using information, including bank statements, provided by J.B. and other authorized agents of J.B. Ellsworth then used those financial summaries to prepare and file federal tax returns for J.B. and J.B.'s entities consistent with Conner's guidance. For example, on May 12, 2017, J.B. sent an email to Ellsworth, with Conner copied, and wrote:

> LARRY CONNER SAYS THE RETURNS NEED: 1) THE TOTAL INCOME ON ONE LINE, 2) THE TOTAL EXPENSES, AS STATED ON THE MONTHLY REPORTS FROM CHASE AND/OR WELLS FARGO, THEN 3) THE DIFFERENCE SHOWING PROFIT AND 4) HOW MUCH WAS SENT ON TO THE OTHER TRUSTS OR FOUNDATION TO DEMONSTRATE THE TAXES HAVE BEEN PASSED ON TO THE 501 (c) (3).

oo.    In total, Ellsworth prepared about thirty-five false and fraudulent federal tax returns for Participant J.B. and J.B.'s businesses, sham trusts, and purported foundation for tax years 2016 through 2021. Those false returns fraudulently concealed from the IRS approximately $1,791,789 in income that J.B. earned from operating J.B.'s chiropractic and healthcare-related businesses and resulted in approximately $432,327 in unpaid federal income taxes owed by J.B.

*Participant D.J.*

pp.    Participant D.J. was another individual who purchased and used the Abusive-Trust Tax Shelter. D.J. hired Ellsworth to prepare false and fraudulent federal tax returns consistent with the fraudulent shelter for tax years 2017 through at least 2021. D.J.'s fraudulent tax shelter included a "business trust" with the initials S.T., a "family trust" with the initials D.A.J.F.T., a "charitable trust" with the initials C.F.C.T., and a "private family foundation" with the initials T.F. Ellsworth knew that D.J. used the Abusive-Trust Tax Shelter and that D.J. controlled and funded those sham trusts and purported charitable foundation. Ellsworth further knew that D.J. did not need permission from any third party to access the funds purportedly held in the name of the trusts or foundation for personal use. For example, on April 14, 2022, D.J. sent an email to Ellsworth in which D.J. described

- 17 -

how D.J. used the sham trusts and purported foundation to purchase a residence for $4.55 million, a luxury boat, and other valuable real estate—all of which D.J. controlled, used, and personally benefitted from:

> Hey Kent [Ellsworth],
>
> We discussed putting our new house in Nokomis, FL into [T.F.] this year. Is it too late. We purchased it in August, 2021, for 4,550,000 and put down $1,550,000 cash. It took a lot of shifting money around to satisfy the lender. The money largely came from the sale of our farm property in Columbia, TN in April of 2021. It was in the foundation you may recall. We profited 1.1M on that sale. However, the lender for the new house would not accept the Foundation being the entity that purchased the house since there was no income. So, at the advice of Larry Conner, we moved it to the [D.A.J.F.T.] Bank account, but the lender didn't like that, so we moved it to the [S.T.] account, which is the only account that has direct money coming into it. The lender didn't like that either, so we sent it as a loan to [D.J.'s business with the initials B.C.F.O.H.] who sent it to my Father in law, who gifted it to me (I had opened a personal bank account in my name) where it was wired. Then the lender was satisfied. Whew!!!
>
> [. . .]
>
> The personal account has never had any money in it since that time.
>
> [S.T.] account pays the house payment at this time.
>
> We also bought a boat for $650,000 where we put down 450,000 cash from the profits from another TN property that was put into the [T.F.] via a quit-claim deed. We had purchased this house for $700,000 in 2020 and sold it in 2021 for $1,257,125.

qq.    Throughout tax years 2017 through at least 2021, Participant D.J. hired Ellsworth to prepare and file federal tax returns for D.J. individually, for D.J.'s sham trusts and purported foundation, and for D.J.'s chiropractic practice and other businesses with the initials H.C.F.O.H., B.C.F.O.H., and S.C. LLC. Ellsworth prepared those returns at D.J.'s direction with guidance from Conner. Specifically, Ellsworth used information provided by D.J. and other authorized agents of D.J., including bank statements for accounts held in the names of D.J.'s sham trusts and purported foundation and annual financial summaries prepared by accountants and bookkeepers for D.J.'s businesses. For example, on April 18,

2021, D.J. sent an email instructing Ellsworth how to file D.J.'s 2020 tax returns:

> Hello Kent [Ellsworth].
>
> Please find the 12 months of bank statements for the [S.T.] account (Business Trust). I also will be sending you the 2020 bank statements for the [redacted] account, which is a dba of [S.T.]. All money coming into these accounts comes from [B.C.F.O.H.] in distributions. I will also be sending you the [T.F.] and [D.A.J.F.T.] bank statements, as well as [redacted] (my wife) and my W-2s.
>
> In 2020 we did a transfer of deed of our new house we purchased through [S.T.] to [T.F.]. This house was purchased for approximately $700K.
>
> On April 1st 2021 I sold my 150 acre farm, which had been deeded to the Foundation several years ago. We made a profit on the sale of approximately $1,047,704.01, the proceeds of which went into the [T.F.] checking account.

rr.      In total, Ellsworth prepared about twenty-seven false and fraudulent federal tax returns for Participant D.J. and D.J.'s businesses, sham trusts, and purported foundation for tax years 2017 through 2021. Those false returns fraudulently concealed from the IRS approximately $5,711,095 in income that D.J. earned from operating D.J.'s chiropractic practice and other businesses and resulted in approximately $1,479,574 in unpaid federal income taxes owed by D.J.

*Summary of False Items*

ss.      On or about the approximate dates listed below, in the District of Arizona, Ellsworth willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS of materially false and fraudulent Forms 1040 for Participant J.B. and Participant D.J., including J.B.'s false Form 1040 for tax year 2018, charged in Count One, and D.J.'s false Form 1040 for tax year 2021, charged in Count Two. The Forms 1040 were false and fraudulent as to a material matter because the Forms 1040 substantially underreported J.B.'s and D.J.'s total income, which resulted in the payment of far lower taxes by J.B. and D.J. Ellsworth knew that the Forms 1040 for J.B. and D.J. were false and fraudulent because, among other reasons, Ellsworth knew J.B. and D.J. used the Abusive-Trust Tax Shelter; Ellsworth reviewed financial statements for J.B.'s

and D.J.'s businesses, sham trusts, and purported charitable foundations; and Ellsworth prepared J.B.'s and D.J.'s business tax returns, which reported considerably more income than Ellsworth reported on J.B.'s and D.J.'s Forms 1040.

| Taxpayer | Year | Date Signed | False Item | Unreported Income | Additional Tax Due |
|---|---|---|---|---|---|
| J.B. | 2016 | 5/1/2017 | Ln. 22, Total Income: $-12,163 | $316,785 | $78,528 |
| | 2017 | 10/2/2018 | Ln. 22, Total Income: $37,729 | $285,653 | $84,702 |
| | 2018 | 4/9/2019 | Ln. 6, Total Income: $15,713 | $428,495 | $117,509 |
| | 2019 | 5/5/2020 | Ln. 7b, Total Income: $18,793 | $249,163 | $43,293 |
| | 2020 | 5/14/2021 | Ln. 9, Total Income: $14,807 | $287,404 | $51,517 |
| | 2021 | 10/12/2022 | Ln. 9, Total Income: $68,576 | $224,289 | $56,778 |
| D.J. | 2017 | 4/10/2018 | Ln. 22, Total Income: $157,075 | $890,104 | $365,347 |
| | 2018 | 5/15/2019 | Ln. 6, Total Income: $56,089 | $506,434 | $160,022 |
| | 2019 | 2/24/2020 | Ln. 7b, Total Income: $52,662 | $562,260 | $212,083 |
| | 2020 | 4/28/2021 | Ln. 9, Total Income: $54,658 | $687,696 | $254,791 |
| | 2021 | 4/16/2022 | Ln. 9, Total Income: $52,369 | $3,064,601 | $297,303 |

u.     The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any

- 20 -

1  intentional material inconsistencies in the defendant's testimony may subject the defendant
2  to additional penalties for perjury or false swearing. which may be enforced by the United
3  States under this agreement.

4  **II.   ADVISORY GUIDELINE CALCULATION**

5       a.      The parties understand that the imposition of a sentence in this matter is
6  governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the
7  Court is required to consider seven factors. One of those factors is the sentencing range
8  computed by the Court under advisory guidelines issued by the United States Sentencing
9  Commission. In order to aid the Court in this regard, the parties set forth below their
10  estimate of the advisory guideline range called for by the United States Sentencing
11  Guidelines.

12       b.      The guideline calculation below is the good faith estimate of the parties. but
13  it is only an estimate. The parties understand that the government has an independent
14  obligation to assist the Court in making an accurate determination of the correct guideline
15  range. To that end, the government may argue that facts identified in the presentence report,
16  or otherwise identified during the sentencing process, affect the estimate below.

17       (1)      The base offense level guideline is Section 2T1.4, and the base offense
18  level is 26 because the actual loss is more than $9,500,000 and less than $25,000,000.
19  U.S.S.G. § 2T1.4(a)(1).

20       (2)      A two-point level increase applies because the defendant was in the
21  business of preparing or assisting in the preparation of tax returns. *Id.* § 2T1.4(b)(1)

22       (3)      The defendant should receive a three-level downward adjustment for
23  timely acceptance of responsibility. *Id.* § 3E1.1(a). (b).

24       (4)      The defendant should receive a two-point downward adjustment as a
25  certain zero-point offender. *Id.* § 4C1.1(a)

26       (5)      The resulting total offense level should be 23.

27       (6)      Based on information currently available to the parties. it is estimated
28  that the defendant's criminal history category would be I.

- 21 -

1         (7)     The advisory guideline range resulting from these calculations is 46

2 to 57 months' imprisonment.

3          **APPROVAL AND ACCEPTANCE OF THE DEFENDANT**

4         I have read the entire plea agreement with the assistance of my attorney. I

5 understand each of its provisions, and I voluntarily agree to it.

6         I have discussed the case and my constitutional and other rights with my attorney. I

7 understand that by entering my plea of guilty I shall waive my rights to plead not guilty, to

8 trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present

9 evidence in my defense, to remain silent and refuse to be a witness against myself by

10 asserting my privilege against self-incrimination, all with the assistance of counsel, and to

11 be presumed innocent until proven guilty beyond a reasonable doubt.

12         I agree to enter my guilty plea as indicated above on the terms and conditions set

13 forth in this agreement.

14         I have been advised by my attorney of the nature of the charges to which I am

15 entering my guilty plea. I have further been advised by my attorney of the nature and range

16 of the possible sentence and that my ultimate sentence shall be determined by the Court

17 after consideration of the advisory Sentencing Guidelines.

18         My guilty plea is not the result of force, threats, assurances, or promises, other than

19 the promises contained in this agreement. I voluntarily agree to the provisions of this

20 agreement, and I agree to be bound according to its provisions.

21         I understand that if I am granted probation or placed on supervised release by the

22 Court, the terms and conditions of such probation/supervised release are subject to

23 modification at any time. I further understand that if I violate any of the conditions of my

24 probation/supervised release, my probation/supervised release may be revoked and upon

25 such revocation, notwithstanding any other provision of this agreement, I may be required

26 to serve a term of imprisonment or my sentence otherwise may be altered.

27         This written plea agreement, and any written addenda filed as attachments to this

28 plea agreement, contain all the terms and conditions of the plea. Any additional

1    agreements, if any such agreements exist, shall be recorded in a separate document and

2    may be filed with the Court under seal; accordingly, additional agreements, if any, may not

3    be in the public record.

4        I further agree that promises, including any predictions as to the Sentencing

5    Guideline range or to any Sentencing Guideline factors that will apply, made by anyone

6    (including my attorney) that are not contained within this written plea agreement, are null

7    and void and have no force and effect.

8        I am satisfied that my defense attorney has represented me in a competent manner.

9        I fully understand the terms and conditions of this plea agreement. I am not now

10   using or under the influence of any drug, medication, liquor, or other intoxicant or

11   depressant that would impair my ability to fully understand the terms and conditions of this

12   plea agreement.

13

14   4/23/24
                                 KENT ELLSWORTH
    Date
                                        Defendant

15

16                     **APPROVAL OF DEFENSE COUNSEL**

17        I have discussed this case and the plea agreement with my client in detail and have

18   advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

19   constitutional and other rights of an accused, the factual basis for and the nature of the

20   offense to which the guilty plea will be entered, possible defenses, and the consequences

21   of the guilty plea including the maximum statutory sentence possible. I have further

22   discussed the concept of the advisory Sentencing Guidelines with the defendant. No

23   assurances, promises, or representations have been given to me or to the defendant by the

24   United States or any of its representatives that are not contained in this written agreement.

25   I concur in the entry of the plea as indicated above and that the terms and conditions set

26   forth in this agreement are in the best interests of my client. I agree to make a bona fide

27   effort to ensure that the guilty plea is entered in accordance with all the requirements of

28   Fed. R. Crim. P. 11.

1

2    _4/23/24_____    _____
    Date                           JASON SILVER

3                                      Attorney for Defendant

4                      **APPROVAL OF THE UNITED STATES**

5         I have reviewed this matter and the plea agreement. I agree on behalf of the United

6    States that the terms and conditions set forth herein are appropriate and are in the best

7    interests of justice.

8                      STUART M. GOLDBERG

9                      Acting Deputy Assistant Attorney General
                               Department of Justice, Tax Division

10

11   _April 19, 2024_____    _/s/ Amanda R. Scott_____
    Date                         AMANDA R. SCOTT

12                     Trial Attorney

13                     Department of Justice, Tax Division

14

15   _April 19, 2024_____    _/s/ Lauren K. Pope_____
    Date                         LAUREN K. POPE

16                     Trial Attorney
                               Department of Justice, Tax Division

17

18                      **ACCEPTANCE BY THE COURT**

19

20

21   _____    _____
    Date                         Honorable
                                 United States District Judge

22

23

24

25

26

27

28

- 24 -